I guess we don't have to go over the timing because we have the order setting the time and you're all familiar with that and we're going to keep pretty close to that to say you know. And when you do step up though, please state and spell your names for us. Now the microphone doesn't amplify so keep your voices up, it just records. So be sure to keep your voices up. Okay, Ms. Ware are you starting? May I please the court? My name is Jessica Ware, J-E-S-S-I-C-A-W-A-R-E, on behalf of the Office of the State Appellate Defender and I represent one of the appellants, Jillian Stacey. Your honors, today I'd like to focus my argument on issues one and two from the briefs. Your honors, in order to prove that Jillian Stacey was guilty of kidnapping her sister, A.H., from March 11, 2015 to March 30, 2015, the state had to establish beyond a reasonable doubt that A.H. was secretly confined against her will during that time frame. However, the overwhelming evidence at trial showed that during that time frame, A.H.'s exact whereabouts was known by multiple public authorities, including BCFS, school officials at Dewey, and the Chicago Police Department. But you said against her will, but that really isn't when they're 13 or less, it's without the consent of the... Correct. Okay, thank you. Yes, correct. So by March 11, the date that the alleged kidnapping was to have started, these public authorities that I named had known for weeks that A.H. was living at 652 West Garfield in Chicago with her grandmother and they were given telephone numbers on how to reach her there. The Supreme Court in People v. Posh explicitly held that where many people are quite aware of the victim's location, a kidnapping conviction cannot stand. And People v. Posh is particularly instructive in this case because of the unique facts. In People v. Posh, the defendant killed his landlord, ran next door, took a hostage, took a woman hostage, and the woman's sister immediately alerted a neighbor that her sister was being held inside the house hostage. The police came, the defendant shot one of the police officers, and there was a long standoff between the defendant and the police. And in that case, the court held that the state failed to prove that the defendant secretly confined the sister in the apartment because, and I quote, many people were quite aware that the sister was restrained in the apartment. And the fact that no one could rescue her because of the hostage situation did not convert that which was otherwise well known to something that was secretive. And that's what we have here. Many people were aware of A.H.'s whereabouts. A.H. testified that she was living with her grandmother the entire time. DCFS investigator Karen Wilson testified that she knew A.H. was living with her grandmother and she had the address and the phone numbers. She said that she passed that information on to A.H.'s school. Many officials knew where A.H. was during this time of the alleged kidnapping. The police knew. And also, many people were quite aware that A.H. not only was she living with her grandmother, but attending Dewey School on 54th and Union during that time. But teachers knew, staff knew, as I said before, Wilson knew. All of these people knew. And even her father, Oliver Holt, knew that she was attending that school because Oliver testified that when he went up to the school to get A.H. the school told me they wouldn't allow me access to my daughter. They wouldn't allow me to take her. So that shows that he knew that she was there. But the fact that the school would not allow him access to take her does not convert that which was otherwise well known to that which is a secret. That's what People vs. Posh says. Access, just because somebody is being denied access to someone doesn't convert it into a secret. And that's what we have here. And the state argues that even though DCFS and the police and the school, all of these public entities knew exactly where A.H. was, the state argues that because Holt, the father, claimed not to know that that's enough for secret confinement. But the state cites no case that says that public authorities can know, protective services can know the location of the alleged victim. But as long as the parent is kept in the dark, there's secret confinement. The state has cited no case that says that. And in this case, Stacey, Julianne Stacey, could not have been keeping A.H.'s location at her grandmother's house a secret from Holt when the defendants are the ones who gave the address and location and phone number to DCFS. The defendants are the ones who let DCFS know way back in February where the girl would be at. And so the defendants are aware that protective services is involved with all the parties here. Protective services is talking to Holt, they're talking to the defendants, to A.H., and the defendants have given that information over to DCFS long before this alleged kidnapping was to have started. Now, the defendants personally could not have contacted Holt and said, you know, this is the address where she is, because there were orders of protection going both ways against the parties. So they could not contact him. And so they did all that they needed to do by giving the information to the authorities. The state analogizes this case to People v. Gonzalez, a stolen infant case where the defendant takes the baby from the hospital. But I cannot stress enough how different this case is from the line of cases, from the stolen infant cases. People v. Gonzalez is a Supreme Court case just like People v. Posh. People v. Posh says that where people are aware of where the victim is, there is no secret confinement. Gonzalez does not overrule that. Gonzalez, in fact, cites to Posh. The only thing that Gonzalez does is Gonzalez acknowledges that when there is an infant that is stolen, that there are other concerns at issue, because an infant can be in public view, but still be isolated from the public, because an infant can be covered up and concealed, an infant cannot talk, it cannot tell you who they are or who their parents are. Those type of concerns we do not have in this case. A.H. was talking. She was going to school as A.H. She was going about her normal business as A.H., daughter of Oliver Holtz. None of that was being concealed by the defendants. Her address was not being concealed, the phone numbers, who she was, her identity, none of that. And so based on People v. Posh and People v. Gonzalez, Your Honors, if you all do not have any questions about that issue, I ask for you to reverse the defendants' Julian Stacey's kidnapping conviction, and I'll move on to the second argument, if that's… Great. Thanks. Your Honors, in order to prove Julian Stacey guilty of child abduction, the State was required to establish that she intentionally violated the terms of a valid court order granting temporary custody of A.H. to Oliver Holt, and case law has held that in order for a person to be guilty of child abduction, there must be three things. One is he or she must know that the valid order was entered by the court, they must know what the order holds, and they must know what the terms for compliance of the order are. That's People v. Magana Ortiz. The undisputed evidence at this trial was that Stacey was never served with the order. She never received the custody order. And on March 11th, the very next day after Holt got the custody order, when he tried to present the order in court at the order of protection proceedings, the judge, in Stacey's presence, called the order irrelevant and said it had no merit in that courtroom. And that is what – that is all that Stacey knew about this order that Holt said he had, is that a judge had called it irrelevant and said it had no merit. The judge… Is there more? Because you say eloquently that they need to know that the order exists, know the terms of the order, know what the order holds. I think there's more required. I think that, based on my reading of the statute, that it also requires intent, which intent is a higher measure than knowledge. I think it requires that you – because if you are – if you have a situation where a parent has passed away and a grandparent has a right to have visitation with a child, and say the mother has passed away and the father has to take the kids to the grandparent's house, and the grandparent has a right to visit the child, and the father has to take the kids to the grandparent's house, and the grandparent has a right to visit the child. And the grandparent's house, the mother's parents' house, their maternal grandparents, for them to visit on a weekly basis. And one day the father is on his way there and one of his kids says, well, this happens to me at the home and this is what's some sort of sexual abuse or other kind of abuse. And the father chooses – and the father does not take the kids there. And there's an alleged violation of the order because the father knowingly is not taking the children there. But I think the father's intent in that case was to protect the children. It was not an intent to violate the court order. And that's how I read all of this. I see a much bigger picture than anyone has addressed. Nobody addressed that in their briefs. And I think that many people have missed that on this issue. There's three issues here, but this issue is the only issue I'm speaking to. And of course the state will get a chance to respond to it, but that's what I see. Well, there was evidence in the record. Mandy testified that the investigator, Wilson, that she's the one who advised for A.H. to live with the grandmother at this time while this big dispute is going on and they're, you know, going back and forth and nobody's, you know, agreeing with each other. And so there is a reason on the record as to why she was living there with her grandmother. It's mentioned in the briefs that there was an attorney representing the defendants in court when that order was entered on March 10th. I don't want to get into there's two orders we're dealing with, but I think it's the custody order, right? Correct. But that attorney was never named. It wasn't developed. I'm not sure what that's all about. That's just Holt's testimony. He thinks that he saw a lawyer that was representing the defendants in court, but the physical evidence that the state submitted, the actual order, says that only Holt and his attorney were present. Now, it makes no sense that the defendants would have had an attorney present, because if they did, why would Julia Stacey need to call the investigator right after she left court on the 11th to ask her, hey, what's going on with this order? If she had an attorney that was present there, she would have known or she would have called the attorney. So that evidence was contradicted. Holt says that he thinks they had a lawyer there, but the order clearly shows that the parties present were Holt and his lawyer. It was an emergency proceeding, and there's no evidence on that physical order that any other attorneys were there. Was that order put in evidence in this criminal case? Yes. Okay. Yes, yes. The custody order. Yes. As People's Exhibit 1. Okay. Yes, it's in the record. So Karen Wilson's testimony also corroborates the fact that Stacey was unaware of the validity of this custody order, because Wilson says that on March 11th, when Holt tried to present the order in court, that Stacey called her right after court and said, you know, Holt tried to present this order, you know, what's up with that? And Karen Wilson tells her, I don't know if the order is valid. I've never seen it before. And so here you have Julianne Stacey. All she knows is the judge calls it irrelevant. The DCFS investigator that's working with her says, I don't know. I don't have a clue. I haven't seen it. Stacey's never been served with it. And so for those reasons, she had no reason to know the term, certainly, because she'd never seen it before. No reason to know even if it's valid, because Karen Wilson can't even tell her that. But despite this lack of evidence, the court found Stacey guilty of child abduction based on a misapprehension of the evidence. The court specifically stated in finding her guilty that Karen Wilson testified that she told Stacey on March 12th that the order was valid, when actually Karen Wilson testified the opposite. She says, I did not tell Stacey that the order was valid. She says she never spoke to Stacey about the order. And so the court misrecalls the evidence and believes that she was informed by Wilson, and that was not the evidence at all. And Magana Ortiz, the case that I cited in the motion to cite additional authority, that case addressed this very issue. In that case, the defendant's former lover, Juan, went to court, got a custody order, full custody for their son. The defendant was not present in court, did not receive a copy of the order, just like in this case. But Juan's wife told the defendant, my husband has full custody of the son. The defendant takes the child and leaves. The court held in that case that the defendant could not have committed child abduction because she was not served with notice of the custody order, did not have any knowledge that such order was validly issued, and if one had, she did not know what the terms were. And the court found that even though Juan's wife told her about the custody order, that that wasn't enough because she could have reasonably, the defendant could have reasonably viewed a statement from the defendant's wife, who's an adverse party, as suspicious. And that's what we have in this case. We have Stacey not receiving the order, doesn't know the terms, never seen it, never served with it, and we have just Holt in court saying, I have an order, which she could have viewed as suspicious because these parties are fighting like cats and dogs. They don't trust him. They, you know, they believe he's abusive. You know, there's bad blood and everything like that. So why would she believe what he says, and Karen Wilson can't even advise her if it's true. So for these reasons, I'd ask this court to follow Magana-Ortiz. It is precisely on point with this case, and I'd ask the court to reverse all three of the defendant's convictions. Thank you. How much time did they spend in custody? 156 days, I believe. Well, they were given 156 days. My question is how much time did they actually spend in custody? I believe they spent 156 days. So it was a time served thing? No. Okay. Well, I know what was sentenced, and I believe that they served the full sentence. Yes. Thank you. Thanks very much. Thank you. May it please the court. My name is Daniel Mallon. D-A-N-I-E-L-M-A-L-L-O-N. I am also with the State Appellate Defender's Office. Also with the State Appellate Defender's Office. I'm with the State Appellate Defender's Office. And I represent Mandy Jackson. This is obviously a very fact-intensive case with a lot of different moving parts. So I'd just like to highlight a couple of key facts as they pertain to my client. This obviously all began... Tell us why you think it should be reversed. Well, it should be reversed because the charges are based on the conduct between March 11th and March 30th. So as we're all aware, what happened was March 10th, Holt gets a protective order against Jillian and Mandy, preventing them from contacting him. March 11th, he gets the custody order. And March 12th is when DCFS contacts my client and says the custody order is valid and the child should be released to the father. But at that point, the child was not in physical custody of Mandy. She had been living with the grandmother since early February. So Karen Wilson from DCFS calls up Mandy and says the order is valid, you have to release the child. So Mandy says, okay, like I told you two weeks ago when we reported some of these potential allegations, the child's with her grandma. And I am forbidden from contacting Holt. I couldn't release him to the father if I wanted to. So at least to the charges, the kidnapping charge and to the child abduction charge... In fact, that was the agreement of the parties, right? That grandmother and Mandy would kind of take care of her because Stacy was off in college. Stacy was off in college up in Madison, Wisconsin. The girl's mother passed in May of 2014. Mandy agreed to move back to the house and take care of the day-to-day care of the child to bring her to and from school, while Holt agreed to pay the bills. Fast forward, I think it was about January of 2015, Holt, there was some dispute. He stopped paying the bills. And then around February, early February of 2015, Mandy asked... So I don't have to walk her to school. That causes an argument and then Holt is upset because he thinks the child's tardy too many times to school. So a big dispute occurs in early February, February 6th. There's testimony on both sides that things, threats of violence, threats of verbal disagreement becomes physical. So the child goes to stay with the grandma around February 6th. And then around mid-February, Mandy hears from another cousin of some potential allegations of abuse, of inappropriate touching. And she discusses this with her other family members and calls DCFS and reports the allegations. And she tells DCFS exactly where the child is located at that point. She tells DCFS that the child is at her grandmother's house. She's no longer with me. She's at her grandmother's house. Here's the address. Here's the contact information. Here's the phone number. They also made the child's school aware of where the child was staying. So at that point, fast forward to March 10th, March 11th, these battle of custody orders, battle of protective orders. And again, the convictions should be reversed because the key element, the central element is concealing the child, is confining the child secretly. She was the one that notified DCFS exactly where the child was staying. And she is called on DCFS and the custody order is valid, released the child. There was nothing she could do to release the child. So for those reasons, between March 11th and March 30th, she did not have physical custody of the child. It would have been illegal for her to contact the father. So the state, not a shred of evidence was presented. Can you take a minute and respond to the disorderly conduct charge? That was the same information that was related to DCFS that I spoke with my 12-year-old cousin who told me. Yes, correct. So the grandmother ran a daycare. She was a mandated reporter. That was in the record. And so basically, Melody's testimony that she heard from the cousin about the allegations was unrebutted. The cousin never. The trial court seemed to, in his ruling, seemed to find it significant that the cousin said that she was told that the father touched her. The trial court said that that isn't what was reported, that more was reported. What's your position on that? Yes, correct. It was after cross-examination and redirect and recross, the trial judge questioned Mandy herself and said and asked her, well, you heard from your cousin about touching. What kind of touching was that? And you can't tell from the transcripts, but he later on ruled that there was a pause between the touching and what was qualified as inappropriate. I mean, in my, our position is, well, he seems to agree that the cousin told Mandy that there was touching. And if he's, and so I don't really, I really didn't understand what his ruling was if he was determined that, you know, it was disorderly conduct to report touching without being specifically told it wasn't. It was inappropriate touching. But nevertheless, there was nothing rebutting that testimony. He seemed to, I guess my point is, he seemed to believe that the cousin told Mandy that there was touching. What did Mandy tell DCFS? It's not exactly clear from the record. It was, I think Mandy contacted DCFS about potential sexual abuse allegations. And so it's our position that, yes, thankfully the allegations were unsubstantiated. That's obviously a good thing. But it would be, we want, I would argue, people to report allegations. And she didn't go to the police. She went to the exact agency that you're supposed to. And she, the child testified that Mandy never told her to lie. You would think if someone's trying to, you know, get someone in trouble for something they wouldn't do, they would, you know, suggest to the child, coach the child into talking to the DSFS investigator and say that. But she said the child herself testified that no one told her to lie. The cousin who Mandy said told her, the 12-year-old cousin, told her about the allegations. She didn't testify at trial. So there was simply nothing rebutting her testimony that, you know, she actually, in fact, heard this from her cousin. So we would argue, for the reasons just discussed, that all three charges should be reversed. In the 156 days in the Coatani trial, that was prior to trial. Well, it was my understanding from my reading of the record I just read today that it was, they spent about 35 days in custody pre-trial, and then bail was revoked after the convictions. And then the trial judge sentenced them to, he wanted to sentence them to three times the amount of days that the child was staying at the grandmother's house, in addition to $773 in fines. So had they completed their probation successfully? Correct, yes. Both ladies? I can only speak on behalf of Mandy. Ms. Ware? Okay, thank you. Anything else? Thanks very much. Thank you. Your honors, may it please the court. My name is Assistant State's Attorney Zachary Slavins, S-L-A-V as in Victor, E-N-S, and I represent the people of the state of Illinois. When told by Mr. Holt that he intended to move with his daughter to the west side of Chicago to be closer to school, these defendants decided that they were going to keep A.H. with them no matter what it took. And even though Mr. Holt went back to that house more than eight times with the police, he searched at her school, he went to two different courthouses and filed a missing persons report. And even though defendants knew he was making all of these efforts to get his daughter back, these defendants never gave her back, never told him where she was, never told the police officers coming to the house where she was. Two things. One, you said that he went to school, but he knew she was at school, right? No, your honor, the record does not indicate that. And this brings us to the other. Why did he go to school? Mr. Holt knew that his daughter had been taken from him, and he was searching for her anywhere that she might be, as any parent would do if their child was missing. What was the evidence of what happened at the school? Did they tell him they didn't know where she was, or they said she's in class, you can't see her because she's in class? Or that there's a protective order. Well, we have two periods of searching. There's the pre-March 11th where we have a lot of evidence that she was not at the school. So if he's going to the school and she's not there, he obviously doesn't know that she's there if she's not there. Those days don't matter, because those days were not, that wasn't the issue at trial, so get to the issue at trial. Yes, the issue at trial is he went to the school, I believe, on March 12th, and he's told the DCFS letter is still in effect. So they weren't allowing him to see her, talk to her. The record's unclear if they confirmed she was there or not. But dating back to the pre-charge conduct. Isn't it unfair to infer that if they're telling Mr. Holt that you cannot see her, that she's there? If the school officials are telling him that, does that sort of make sense? That might be one inference, but that would require drawing an inference against the standard of review, which is all inferences in the light most favorable to the process. What's the reasonable inference in favor of the state? If the father goes to the school and the school officials, quote, say you can't see the person you're looking for, what's the reasonable inference from that as it pertains to these two prosecutions? That would be something more aligned along the lines of a Glomar response. We can either confirm or deny she's not here. We're not letting you in. And that inference is in favor of the state and against the defendants in what way? What do the defendants have to do with the school officials' representation, you can't see her? Well, because the reason that Mr. Holt is not able to see them by virtue of the school defendants is because of what the defendants did, namely, go to DCFS and make a false allegation of sexual abuse. Now, we're talking about, did the school officials say because there's an allegation of sexual abuse, you can't see her? I'm trying to relate this to what reasonable inference can a trier of fact take from the fact that a parent, a father goes to a school and wants to see a child, and the school official says you can't. How does that inure to the state's benefit as a reasonable inference in proving beyond a reasonable doubt the charges against these two ladies? Well, that wouldn't be what we would hang our hat on. We'd hang our hat on his testimony that he didn't know where his daughter was. And the fact that... Okay, if you're not hanging your hat on it, then we shouldn't consider that as it relates to evidence of beyond a reasonable doubt of the guilt of these defendants on these charges. That's the logic of what you just said. Perhaps, Your Honor. Well, we would... The people argue that she was secretly confined, not at the school necessarily, but she was secretly confined by defendants at Ms. Wallace's, the grandmother's, home. Because, again... So all the evidence that you put in or that was in the record with respect to her, you know, what I would call usual attendance at school should be disregarded as irrelevant as it relates to the evidence of guilt or innocence? Well, the defendants primarily rely on this evidence as evidence that he knew where she was. Therefore, she could not have been kidnapped. The State contends just because he searched at the school looking for her doesn't mean that he knew she was there. I don't think that was the defense's argument, that because he knew. The defense's argument is because so many people knew. You're misinterpreting their argument. That is one of their arguments. No, their argument is clearly that so many people knew. He's one of the so many people. That's their argument. Clearly, that's their argument. And also, you're conflating some things here. You refer to the not founded as a false allegation. Just because something is not founded as DCFS, it doesn't make it a false allegation. There are sometimes allegations that are not founded, and they're not false. Yes, Your Honor. You don't seem to understand how this works. Well, in this circumstance, we have the testimony of A.H. who said, I was not abused. I never told anyone I was abused. The defense here doesn't make the report that was made that my 12-year-old cousin told me that the child says that she was sexually abused or touched inappropriately or whatever it might be, because if this information comes to an individual, it's not up to the individual to go and investigate, confront the father and ask, did you do this? No, it needs to be reported, and DCFS does the investigation. Individuals, it's not up to them to do an investigation. When that information comes out, that's what DCFS does. They investigate. And then they did that and it came back unfounded. It still does not make it false. It doesn't make the allegation false, and it doesn't make the information that Ms. Jackson or Ms. Stacy provided to DCFS false. Well, with respect to that. We're talking about guilt beyond a reasonable doubt. Yes, Your Honor. And with respect to that issue, I'd like to reply specifically to something that opposing counsel for Jackson represented in that the court was asking about Kiana, the 12-year-old cousin, when the court sui sponte questioned Jackson. The court was asking whether or not she had gone and ever asked A.H., and Defendant Jackson testified, yes, I did. And then the court asked her, well, what did she say? And after a pause, Defendant Jackson just replied that he touched her. So there's a little bit of a misconstruction of the record there with respect to who is being talked to, but it was clearly in front of the court that the A.H. denied that this ever occurred, and she denied she told anyone. The issue isn't that. It's what did the cousin, Kiana or whatever, tell the defendants? Because wouldn't it be reasonable to expect an adult to report if someone said that there was abuse? Wouldn't that be more than reasonable? Wouldn't it be kind of expected? If there is a reasonable basis to believe that the allegation of a crime is true, then it should be represented. However, here the evidence showed that there was no reasonable basis to believe that child sexual abuse, as defendants reported, had occurred. We have A.H. denying that it ever occurred and denying that she ever told anyone. But you said A.H. said that she was touched. No, she denied having that ever occurred. She denied that, but the defendant testified that she asked her and she said she was touched. Yes, the defendant testified to that. But to the extent that there is conflicting testimony, the circuit court was the one sitting there observing these witnesses, and it was for the circuit court to exercise its judgment of their credibility and the weight. And as the judge explained, he did not find Jackson's testimony to that point particularly convincing as giving rise to a reasonable belief that her allegation that not just, you know, my cousin said somebody touched my other cousin, but that the allegation of child sexual abuse was reasonably believed by Jackson when she made it. Now, Stacy was convicted of this. Yes, Your Honor. But did she, are there any allegations she told anybody this? Yes, Your Honor. Who is that? That would be Detective Chills. The detective testified in this case. She was the one who arrested Jackson and Stacy and took their statements at the station. And through her testimony, she elaborates among another number of things that both Jackson and Stacy admitted to her that they were the ones that went and made the initial report. And again, where the alleged victim of this abuse denied ever having been abused, denied ever telling anyone that she had been abused, a reasonable trier fact could find from that evidence that there was not a reasonable basis for the defendants to believe what they were reporting to DCFS. The state's not saying that people should not report these things. They should if there's a reasonable basis to do so. That's not what the defendants did here. Turning back to the issue of the kidnapping, though, even if this court is declining to accept that it's the people liable to be affected by the taking that is relevant for the inquiry and we want to look at the broader public, these people still proved kidnapping beyond a reasonable doubt. Illinois case law is very clear that the secrecy element looks to whether or not the location or the fact of confinement is concealed. And that is precisely what we have here. Well, you argued the defendant kept AAH's confinement secret by preventing her from having meaningful public contact. Yes. But she went to school. Yes, Your Honor. She was still attending school. Well, wouldn't she have public contact at school, meaningful public contact? Your Honor, the meaningful public contact and the cases that discuss this looks to whether or not from the circumstances present, the public would understand that this person was being held against their will. And I know that opposing counsel in their briefs attempted to distinguish the automobile cases on the idea of a moving versus fixed location. But the holdings of those cases all make clear that just because a person is present in the public sphere does not mean that they're not being publicly confined. And in particular, the Gonzalez case is very on point here. The case didn't say she was secretly confined just because she was an infant. The holding in Gonzalez explains that the mother, the parents lost the child. She was taken by the defendant. And that defendant took a number of steps to make it appear to everyone else looking in that this was a normal situation that was going on, that she was a mother with a child, she had a blanket, she was carrying her around, passing her off as her own baby. And it is those facts that led the court to affirm her conviction there. And that's what made it secret confinement. She was always in public. Everyone always knew where that child was. They didn't know she had been taken. Address the difference between a baby and a 7-year-old. Well, yes, there are some differences between a 7-year-old and a baby. However, those differences aren't so great as to make the case inapplicable. Well, but the 7-year-old in this case is independent at school as opposed to in someone's arms, a baby in someone's arms that can't express anything. Isn't that kind of significant? It is relevant, Your Honor. However, what's also relevant is the attendant's circumstances of the kidnapping. And that is what we look at here for whether or not this person was secretly confined. And here it's unlikely that even A.H. realized that she had been taken. She was 7 years old. Jackson was her normal caretaker. Stacy regularly took care of her as well. She regularly saw her grandmother. So to her, even, this was a normal situation for all she understood. And she's 7 years old. She's not just suddenly deciding to live at Wallace's house. She's not able to just decide, I'm going to leave. She's a 7-year-old. And if she doesn't realize that she has been taken against her father's will and is being held at a place where he doesn't know where she is, against his will, that is a secret confinement. And even though the defendants were communicating to the school and DCFS, oh, we have her with us, she's staying here now, crucially, the record is devoid of any evidence that these people were made aware that, oh, yeah, we took her away from her father against his will. He's coming to the house 8 times with police looking for her and hiding her. So the police had no idea that Mr. Holt had this custody order. And the police and DCFS had no idea that Mr. Holt could not see his daughter at school? I mean, it really is difficult to think that neither DCFS or the police department could not have gone to school, or anywhere else for that matter, introduced themselves and Mr. Holt and gained access to the child. I mean, this is really a bizarre set of facts. The people who can see this is a very unique set of facts. Right. Unique? Yeah, right. I mean, that's a professional concession. So as unique as it is, it tests the standard of whether the evidence is so unsatisfactory as to prove all the elements of the offenses charged. I mean, it's just, you've got a lot of factors here that just, under normal thinking, one would not suspect kidnapping, disorderly conduct, child abduction. Well, that's what I'm struggling with. Well, with respect to the kidnapping charge first, Illinois law has established that there's not a minimum duration for kidnapping. Once the circumstances of the kidnapping exist, that is accomplished kidnapping. But how does the grandmother fit into this? She was the location where the child was being kept, and it's unclear to what extent. She wasn't charged, correct? I'm sorry? The grandmother was not charged? The grandmother was not charged, no, Your Honor. And has Jackson lived someplace else at the time? She didn't live with the grandmother, did she? No, Your Honor. Jackson resided at the 53rd Street home. Which is not the grandmother's, right? That is correct. It's not the grandmother's. And then Stacy, from March 11th to March 30th, wasn't even in the state. Is that correct? That was her testimony, that she was not in the state. We know that she was in the state on at least the 11th and the 30th. And we have the testimony from A.H. that throughout this time period of February 6th to the 30th, she was regularly seeing both of her sisters. And we also have the testimony of Detective Chills, who testified that Stacy represented to her, yes, me and my sister are doing this together, we have her. And a reasonable inference can be drawn that she was present at least some time. And even if she wasn't, she was directly involved throughout this process. So you're relying on her statement to the police officer as your evidence of her participation in the confinement? Yes, Your Honor. We certainly rely on her admission to the police officer that her and her sister took the child away and intended to keep her away from Mr. Holt throughout this period as evidence of her guilt for doing that. But with respect... The other justice has already asked you this question, but I just want to clarify it. That at any time, the police could have gone to the school, and the school probably would have given the child to the police. Ultimately, that's exactly what happened, correct? Eventually, yes, Your Honor, the police did. Ultimately, that's exactly what happened. At some point, the police became involved, and they just simply went to the school and said, hey, give us this child. They gave the child to the police, and end of story, right? Which means that that could have happened at any point any day. But it didn't. Because the child was not being confined. The child was in plain view all the time at school every day. Two points, Your Honor. The fact that the police eventually went to the school on the 30th and took the child into protective custody does not diminish that at some point between the 11th and the 30th, the child was secretly confined. And the second point with respect to Your Honor's use of the term plain view, Illinois case law, I believe this is Gonzalo's case, explicitly states that Yeah, being in plain view doesn't matter. As Justice Griffin said earlier, the baby in your arms, that's really different. Baby in your arms is not really in plain view, covered by blankets, and that's not the same. Well, that case actually elaborated that in some instances, it may be more effective for a defendant to hide a victim of kidnapping in plain view, which is what the people contended occurred here. These defendants created a situation and an impression to the general public that the child was properly with them, this is normal, there's a thing with the dad, but this is okay. And for all the public was aware, there was a custody thing going on, there's a dispute. The public was not aware that they had taken the child away from the father against his will and that they were holding her there, not allowing him to come see her, and refusing to give her back. The school was aware that she did not have contact with the father based upon the letter from DCFS. The letter states that the school is not allowed to have Mr. Holt have contact with the age. That doesn't mean the school is aware that outside the school he was also being denied access. And it doesn't mean the school is aware that she had been taken away from him against his will improperly by the defendants as well. So there's a litany of things that the general public was unaware of here. But the enforcing authorities were well aware. DCFS and the police department. The police department was made aware through a missing persons report and they eventually, pursuant to that, located the daughter. DCFS, though, again, Jackson and Wallace in particular went to DCFS and held themselves out as co-parenting the minor child, using a term of art to create a specific impression that we have this child properly. But there was also testimony that DCFS said to both defendants that there's a valid court order giving custody to Mr. Holt, right? That was on the 12th, Your Honor. And again, that goes back to no minimum duration. So looking at least at the 11th, Mr. Holt does not know where his child is. On the 11th, DCFS, the school, the police, they're unaware of the fact that she's been taken and confined against her will, which means Mr. Holt's will. So on that date, at least, you have a situation of secret confinement. And there is no minimum duration for that. And a reasonable fact finder could find that those facts proved beyond a reasonable doubt that this was a kidnapping. How does it figure in that on the 13th, I think it was, that Ms. Wilson went to Mr. Holt's house and approved the house and then said it was okay for Mr. Holt to have age? How does that figure in with what you just said, that he was being kept on the 11th, he wasn't able to have the child? Well, was that because of the DCFS investigation or was it because of grandma or was it because of the defendants? It was because of defendants. And we have Mr. Holt's testimony that after court on the 11th, not only did he ask for the child back in court, but he went back to the 53rd Street house with police looking for her again. And he was still not given his daughter back on the 11th. But it wasn't until the 13th that DCFS said it would be appropriate. Isn't that correct? Your Honor, there's no evidence in the record as to specifically when the investigation deemed the allegations unfounded. We know there was a home visit on the 13th in anticipation. She would be returning there and that would be her residence. But we don't have any information as to when it was deemed unfounded. But more importantly, circling back to at least the 11th. Well, if we don't have evidence of when it was deemed unfounded, why is it reasonable to then infer that during this entire period it was founded, that he had right to custody? I mean, you allege a 30-day period essentially, right? From the 15th to the 30th. A 15-day period approximately. But now you're saying that it was never established when it was unfounded. So if it wasn't established when it was unfounded, why is it reasonable to infer in a light most favorable to the State that at some point it was found founded but we don't know when, and therefore these defendants are guilty? To clarify, Your Honor, are you asking about his parental rights? I'm asking about what you just said. Yeah, I'm trying to clarify your question respectfully. Are you asking about with respect to his parental rights or with respect to the sexual abuse allegation? Because there were different proceedings. I just wanted to understand. We were just talking about parental rights. You said it wasn't established when it was unfounded. I'm sorry. I was referring there to the sexual abuse allegation with DCFS. He's been A.H.'s father. He's on the birth certificate. He's raised her for seven years in the same house. No question. On the 10th, he got the custody order that established beyond any question he has the right to custody, which never ought to have been in dispute. So on the 11th, the father. Explain the circumstances of when they were in court and whatever judge that was said that order is irrelevant. She didn't want to see it. He didn't want to see it. What court was it in generally? Was it a domestic relations court? Yes, Your Honor. Yes, and this goes to the child abduction. That was over at 555 West Harrison. So the judge entering the order of protection said, I don't know what this order is. It's from a different judge. That's not what we're here for today. However, there's a couple of key facts that are admitted here. First, it wasn't just Mr. Holt saying, I have custody. It's Mr. Holt and his attorney, on the record, with a copy of the custody order displaying it in court, saying we have this order, not an amorphous idea of full custody like in the case that they cited under supplemental authority. They're presenting the physical order there in court for everyone to see. And not just the judge rejected. The judge said that he wasn't going to do anything on it because it wasn't before the court. They were there for an OP. They weren't there for adjudication of something that had occurred in a different courtroom. We get that, and I think the attorneys get that. But what's a layman's reaction, reasonable reaction, appearing in front of a judge at one party says, I have an order that is in my favor and against them. And the judge says, I don't want to see it. I don't care about it. It's not my order. It's not why I'm here. I mean, no further explanation as to its efficacy, and therefore it's supposed to have this binding effect on these defendants with respect to these charges under these circumstances. Is that right? Yes, Your Honor, in addition to a number of other factors here. We have the fact that Mr. Holt testified. The defendants had an attorney present on the 10th when that order was entered. In Judge Loz's courtroom over at Daly Center. And in addition to that, you have the testimony of both defendants that this court can look at where they say, we knew that there was a custody proceeding going on. We even have Stacey's testimony that she hired an attorney in that proceeding. Did he file an appearance? Your Honor, it's not in the record on appeal. Did he testify in the criminal trial? Did he actually talk to her about what happened in court? Because she wasn't in court when he received the order granting him custody of the child. Correct? There was no attorney. The attorney was in court. She was not there. She herself was not physically present. Right. So did he testify, did the attorney testify at the criminal trial? Yes, I told her about the order. She knew about it. No, Your Honor. The attorney did not testify. So then that's inconsequential then. That doesn't matter. Because the issue here is whether or not she knew about the order. And I go further. And as I stated to the defense counsel, even if she knew about the order, I think that the mens rea, that the legislative place in this statute requires intent. And I don't think knowledge is enough. Yes, Your Honor. And the people can see that certainly the plain language of the statute requires intent. The issue of relating to knowledge is defendants' briefs argue she couldn't have had intent to violate the order. She didn't have knowledge of it, which is why the crux of the briefing is focused on knowledge. People can see certainly seeing the order gives you knowledge of it existing. She spoke with Ms. Wilson that same day. Did you say she certainly saw the order? Did you just say that? Yes, Your Honor. It was displayed in court. Well, come on. You're a lawyer. You've been a lawyer for a long time. When lay people are in court, the order may be shown to everybody except the lay person. And I've been practicing for a long time. And I know how it works. There's no way that order is normally shown to a lay person. So unless you've got evidence of that, that it was shown, you can't just infer that. We have the testimony of Holt that him and his attorney brought the order and showed it in court. Showed it in court. That's still not the same. Show it in court for someone who's in court all the time. That means it may have been shown to the judge who said, I don't want to see it. It doesn't matter to me. Do you think then they walked over to her and said, oh, man, we want you to see it too? Come on now. Let's just use common sense. That didn't happen. Your Honor, we should use common sense. And the common sense is that from Ms. Wilson's testimony, that on March 11th, Ms. Stacey called her and discussed the order and its terms with her, that Holt was claiming he had custody of the child pursuant to a court order. It's my understanding that on March 11th, Ms. Stacey said she had not seen the order yet. She saw the order a couple of days later. That was Ms. Wilson. She saw it the next day. I'm sorry. Ms. Wilson, yeah, said that she had not seen the order. Yeah, but on the 11th, the fact that Stacey is calling her and saying an order exists, Holt says he has it, and he says that it grants him custody, she is communicating the essential term that she violated. She knows the order exists because she told Wilson about it on the 11th after court. Your Honor, I told you that for me it requires intent. It's more than that. It's a different mens rea. The legislator intentionally placed intent in this statute for the very reason that I believe is related to the example that I gave earlier, that if your intent is to protect the child, not to violate the order, that you're not in violation of the statute. That's how I read it. Well, Your Honor, we have her testimony that she's aware of the terms and knows that it says he's supposed to have the child, and then we have her own testimony or her own statement to Detective Chills where she said, our intent was to keep the child with us throughout the period of February 6th until March 30th. She specifically said, we're keeping her with us and away from Holt, and taking all of these facts together, the fact that she knows about the order and its terms, and then she tells Detective Chills, we're trying to keep this child with us and away from the father. That is evidence of her intent to violate an order saying the exact opposite is supposed to occur. You're pretty much out of time. Do you have anything else you want to add? No, Your Honor. We would rest on our briefs. We believe that the cases cited by opposing counsel throughout their briefs are distinguishable, particularly Patch, which dealt with a short time where everyone knew where the individual was and what was going on is particularly distinguishable here where there was a lot of information concealed. And for these reasons, we would ask this Court to affirm defendant's convictions for kidnapping, child abduction, and for disorderly conduct. Thanks very much. Thank you. I just want to correct a couple of things with regard to the record. Opposing counsel said that Mr. Holt went to the school on the 12th to look for A.H. The evidence was that on the 11th he went to the school the day after he got the custody order. A.H. was in school on the 10th, 11th, and 12th. That's in People's Exhibit 3B. So she was there the day that Holt went there, and the school denied him access. And under People v. Patch, being denied access does not convert something into a secret. Also, the State mentioned that the defendants created this narrative that the child was properly with the defendants. How can that be if on the very day that this kidnapping is alleged to have started on March 13th, Stacy is the one who first tells DCFS that Holt claims he has a custody order? So she's the one who gives the information to authorities first that Holt is the one that's saying he has rightful custody. And so she's not concealing the fact of who the child is supposed to be with when she's telling DCFS. Holt says the child is supposed to be with me and he has an order, but Wilson can't tell her whether or not it's valid. And I wanted to correct one more thing. Wilson testified that she did not tell Julianne Stacy whether or not the order was valid on the 12th. She told Mandy Jackson and the grandmother. That's on page 162 and 163 of the record. So if this Court has no further questions of me, I rest on my brace. Thanks very much. Thank you. Counsel? Thank you. I would just like to clarify a point in case I misspoke or misconstrued the record. It's just as to the disorderly conduct charges, and I'm actually reading from the state's brief here, and I agree. The cousin told Mandy that she had asked the child if her father had ever touched her, and the child replied that the father had touched her in her private area. Mandy testified that she believed the allegations were true. Mandy testified she asked the child if the allegations were true, and the child said they were. And then Mandy denied fabricating the allegation, and she denied ever telling the child to lie to anyone or pressure her. So I guess just we would note, yes, the jail time has been served. The fines have been paid. The probation has been completed. But our clients still have these felony convictions on their record, and that's no small thing. So unless the court has any further questions, we would just submit this case for your consideration. Okay. Thank you very much. Thanks. And we really appreciate the arguments and the briefs. You did a great job with it. It's a very unique set of circumstances, as we said earlier. Thank you. We'll take it under advisement. We'll be issuing it shortly. Thank you.